NOT YET SCHEDULED FOR ORAL ARGUMENT

————————————

No. 13-7140

————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

CARLA DOE, *et al.*,

APPELLANTS,

v.

DISTRICT OF COLUMBIA, *et al.*,

APPELLEES.

————————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

————————————

**BRIEF FOR APPELLEES**

————————————

IRVIN B. NATHAN
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

STACY L. ANDERSON
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6625
stacy.anderson2@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—The plaintiffs below, identified by pseudonyms, were Robert and Carla Doe, and their children Emma, Oliver, and Ann Doe. They are the appellants here, with the exception of Emma Doe. The district court dismissed her as a party, and she is not listed as a party in appellants' notice of appeal. Dkt. 37, 211.

The defendants below were the District of Columbia; former District of Columbia Mayor Adrian Fenty, in his official capacity; District of Columbia Child and Family Services Agency ("CFSA") Director Brenda Donald Walker, in her individual capacity; CFSA Child Protective Services Administrator Heather Stowe, in her individual capacity; CFSA Deputy Director Sarah Maxwell, in her individual capacity; CFSA Administrator for Permanency and Family Resources Sandra Jackson, in her individual and official capacities; CFSA General Counsel Terri Thompson Mallet, in her individual capacity; CFSA Social Worker Daphne King, in her individual and official capacities; and CFSA Social Worker Rebekah Philippart, in her individual and official capacities.[*] They are the appellees here.

There were no *amici curiae* below.

---

[*] Mayor Vincent C. Gray should be substituted for Mayor Fenty, as Mayor Fenty was named only in his official capacity.

i

B. *Ruling under review*.—Appellants appeal Judge Thomas Hogan's March 12, 2008, judgment granting in part and denying in part defendants' motion to dismiss (Dkt. 37) and his August 1, 2013, judgment granting defendants' motion for summary judgment (Dkt. 208, 209).  In addition, appellants seek review of Judge Hogan's March 12, 2008, scheduling order (Dkt. 38) and Magistrate Judge Alan Kay's January 31, 2012, order granting in part and denying in part appellants' "Motion to Amend/Correct" (Dkt. 174).

C. *Related cases*.—Appellees are not aware of any related cases.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF THE ISSUES ..............................................................1

STATEMENT OF THE CASE.................................................................2

    1.    The Does' Adoption Of Ann And Oliver, Then Of Wayne And
        Sara Despite Known Concerns...................................................2

    2.    The Does' Disclosure Of Wayne And Sara's Sexual Abuse Of
        Ann And Oliver, And Request For Assistance From CFSA. ...............5

    3.    CFSA's Investigation Of The Sexual Abuse, Interactions With
        The Does, And Efforts To Have Wayne And Sara Placed
        Voluntarily In Its Care. ........................................................7

    4.    CFSA's Removal Of Ann, Oliver, And Sara. ..............................11

    5.    Services For Wayne And Sara And Their Subsequent Juvenile
        Delinquency Proceedings....................................................15

    6.    Proceedings In The District Court...........................................17

STANDARD OF REVIEW ..................................................................19

SUMMARY OF ARGUMENT...............................................................21

ARGUMENT ................................................................................25

    I.    Defendants Are Entitled To Summary Judgment On Plaintiffs'
        Fourth And Fifth Amendment Claims.......................................25

        A.    The Does' Fourth and Fifth Amendment rights were not
            violated by the District's removal of children from an
            environment of sexual abuse.........................................26

        B.    Defendants Sarah Maxwell, Sandra Jackson, Heather
            Stowe, and Terri Thompson Mallett are entitled to
            judgment as a matter of law for the additional reason that
            the Does have not pled facts or produced evidence

demonstrating that they personally violated the Does' Fourth and Fifth Amendment Rights. ......................................32

C.    The individual defendants are entitled to qualified immunity. ......................................................................33

II.    Defendants Are Entitled To Summary Judgment On The Does' First Amendment Retaliation Claims. ..................................................36

A.    The Does' First Amendment rights were not violated because they established no causal connection between their requests for services and the District's actions.................36

B.    Defendants Sarah Maxwell, Sandra Jackson, Heather Stowe, and Terri Thompson Mallett are entitled to judgment as a matter of law for the additional reason that the Does have not pled facts or produced evidence demonstrating that they personally violated the Does' First Amendment rights............................................................41

C.    Defendants Rebekah Philippart and Daphne King are entitled to judgment as matter of law because they did not even know of the Does' exercise of their First Amendment rights...................................................................42

D.    The District is entitled to judgment as a matter of law on the Does' claim that DYRS's closing of the twins' delinquency cases was in retaliation for the exercise of the Does' First Amendment rights. ...........................................42

III.    Defendants Are Entitled To Summary Judgment On The Does' Claim That The District Failed To Provide Post-Adoption Services In Compliance With The *LaShawn A.* Consent Decree........44

IV.    Defendants Are Entitled To Judgment On Plaintiffs' Common-Law Tort Claims. ..............................................................47

A.    Defendants are entitled to judgment on Ann and Oliver Doe's assault and battery claims. ...............................................47

iv

B.    Defendants are entitled to judgment on plaintiffs' invasion of privacy claim.........................................................50

C.    Plaintiffs failed to state a claim for relief on their claim for intentional infliction of emotional distress..........................53

D.    Defendants are entitled to summary judgment on the Does' abuse-of-process claim. ..................................................56

CONCLUSION .......................................................................................58

# TABLE OF AUTHORITIES*

## *Cases*

*Anderson v. Creighton*, 483 U.S. 635 (1987)..........................................................35

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................21

*Andrews v. Hickman Cnty.*, 700 F.3d 845 (6th Cir. 2012)........................................35

*Anton v. Police Ret. Sys. of St. Louis*, 925 S.W.2d 900 (Mo. App. 1996)..............31

*Arredondo v. Locklear*, 462 F.3d 1292, (10th Cir. 2006)........................... 28, 29, 31

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011)...................................................... 33, 35

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................... 20, 32, 41, 48

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) .............................43

*Bame v. Dillard*, 637 F.3d 380 (D.C. Cir. 2011) .....................................................34

*Batten v. Gomez*, 324 F.3d 288 (4th Cir. 2003)................................................ 27, 34

*Bauldock v. Davco Food, Inc.*, 622 A.2d 28 (D.C. 1993).......................................49

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................20

*Brown v. Hamilton*, 601 A.2d 1074 (D.C. 1992) ....................................................56

*Corrugated Paper Prods. v. Longview Fibre Co.*, 868 F.2d 908 (7th Cir. 1989) ....45

*Crowley v. N. Am. Telecomm. Assoc.*, 691 A.2d 1169 (D.C. 1997) ........................54

*Danai v. Canal Square Assocs.*, 862 A.2d 395 (D.C. 2004) ...................................52

---

\*       Authorities upon which we chiefly rely are marked with asterisks.

*DeGidio v. Pung*, 920 F.2d 525 (8th Cir. 1990) .......................................................46

*\*Doe v. Kearney*, 329 F.3d 1286 (11th Cir. 2003) ..................................... 27, 28, 29

*\*Elkins v. District of Columbia*, 690 F.3d 554 (D.C. Cir. 2012)....................... 32, 35

*Etheredge v. District of Columbia*, 635 A.2d 908 (D.C. 1993) ........................ 47, 49

*Floyd v. Ortiz*, 300 F.3d 1223 (10th Cir. 2002)........................................................46

*Garay v. Liriano*, 943 F. Supp. 2d 1 (D.D.C. 2013) ................................................53

*Gates v. Tex. Dep't of Protective & Regulatory Servs.*,
    537 F.3d 404 (5th Cir. 2008)........................................................................ 26, 27

*Georgia v. Randolph*, 547 U.S. 103 (2006) .............................................................52

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .............................................................33

*Haynes v. Williams*, 392 F.3d 478 (D.C. Cir. 2004)................................................21

*\*Holder v. District of Columbia*, 700 A.2d 738 (D.C. 1997) ...................................47

*In re Sealed Case 96-3167*, 153 F.3d 759 (D.C. Cir. 1998)....................................27

*Johnson v. District of Columbia*, 734 F.3d 1194 (D.C. Cir. 2013) .........................33

*Katz v. United States*, 389 U.S. 347 (1967) .............................................................52

*\*Kilpatrick v. King*, 499 F.3d 759 (8th Cir. 2007) ............................................ 38, 39

*LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84 (D.D.C. 2010).................45

*LaShawn A. v. Kelly*, 887 F. Supp. 279 (D.D.C. 1995)............................................18

*Lobato v. N.M. Env't Dep't*, 733 F.3d 1283 (10th Cir. 2013) ........................... 38, 40

*Madden v. D.C. Transit Sys., Inc.*, 307 A.2d 756 (D.C. 1973) ................................48

*Magwood v. Giddings*, 672 A.2d 1083 (D.C. 1996) ................................................49

*Malley v. Briggs*, 475 U.S. 335 (1986) ..................................................33

*Martel v. Fridovich*, 14 F.3d 1 (1st Cir. 1993) .........................................46

*\*Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658 (1978) .........................42

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ...............37

*Ohio v. Robinette*, 519 U.S. 33 (1996)...................................................26

*\*Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158 (D.C. 2013)............................ 53, 54

*Patel v. Allstate Ins. Co.*, 105 F.3d 365 (7th Cir. 1997) ...........................21

*\*Pearson v. Dodd*, 410 F.2d 701 (D.C. Cir. 1969)....................................52

*Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483 (D.C. Cir. 1992) .................19

*Proescher v. Bell*, 966 F. Supp. 2d 1350, 1368 (N.D. Ga. 2013)...........................31

*Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122 (D.C. Cir. 2012) ..........................20

*\*S.E.C. v. Prudential Secs. Inc.*, 136 F.3d 153 (D.C. Cir. 1998) ..................... 44, 45

*Saucier v. Katz*, 533 U.S. 194 (2001 .....................................................33

*Scheffler v Molin*, 743 F.3d 619 (8th Cir. 2014) .......................................37

*\*Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1997)........................ 56, 57

*Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33 (D.C. 1982)....................................53

*Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921 (7th Cir. 2011)..........................27

*Smith v. Mosley*, 532 F.3d 1270 (11th Cir. 2008)......................................37

*Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002) ....................................19

*Sundeen v. Kroger*, 133 S.W.3d 393 (Ark. 2003) .....................................31

*Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011) ....................................................42

*Tate v. District of Columbia*, 627 F.3d 904 (D.C. Cir. 2010) ...................................20

*Taylor v. Reilly*, 685 F.3d 1110 (D.C. Cir. 2012)....................................................34

*Texas v. Brown*, 460 U.S. 730 (1983).......................................................................26

*Tilton v. Richardson*, 6 F.3d 683 (10th Cir. 1993)............................................ 26, 49

*Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997)...........................42

*United States v. Armour & Co.*, 402 U.S. 673 (1971) ............................................45

*United States v. Sawyer*, 441 F.3d 890 (10th Cir. 2006) .........................................34

*United States v. Schmidt*, 700 F.3d 934 (7th Cir. 2012) .................................... 27, 31

*Virginia v. Moore*, 553 U.S. 164 (2008)..................................................................34

*Wolf v. Regardie*, 553 A.2d 1213 (D.C. 1989) ........................................................51

*Wood v. Neuman*, 979 A.2d 64 (D.C. 2009).............................................................57

*Xiong v. Wagner*, 700 F.3d 282 (7th Cir. 2012) ................................................ 26, 29

*Zann Kwan v. Andalex Group LLC*, 737 F.3d 834 (2d Cir. 2013) ................... 38, 40

## Statutes

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. § 1331 ..........................................................................................................1

28 U.S.C. § 1367(a) ......................................................................................................1

D.C. Code § 4-1301.01 (2012 Repl.) .........................................................................49

D.C. Code § 4-1301.06 (2012 Repl.) .........................................................................49

D.C. Code § 4-1301.07 (2012 Repl.)........................................................49

D.C. Code § 4-1303.04(b) (2012 Repl.) ..................................................49

D.C. Code § 16-2301(9)(A)(i) (2012 Repl.)...............................................9

D.C. Code § 16-2301(9)(A)(ii) (2012 Repl.)..............................................9

D.C. Code § 16-2305(a) (2012 Repl.) .....................................................14

D.C. Code § 16-2309(a)(1) (2012 Repl.)..................................................34

D.C. Code § 16-2309(a)(3) (2012 Repl.)..................................................34

D.C. Code § 16-2309(a)(4) (2012 Repl.)..................................................49

## Other Authorities

Restatement 2d of Torts § 682 cmt. b (1977)...........................................56

## Rules

Fed. R. Civ. P. 8(a)(2)...........................................................................20

Fed. R. Civ. P. 12(b)(6) ........................................................................19

Fed. R. Civ. P. 12(c) ............................................................................19

Fed. R. Civ. P. 56(c) ............................................................................20

Fed. R. Civ. P. 71................................................................................46

## GLOSSARY

CFSA            District of Columbia Child and Family Services Agency

DYRS            District of Columbia Department of Youth Rehabilitation
                Services

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367(a).  Plaintiffs filed a timely notice of appeal from the district court's August 1, 2013, final order on September 3, 2013.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The district court granted the District of Columbia defendants summary judgment on a variety of claims challenging the District's decision to remove young children temporarily from a home where they undisputedly had been suffering sexual abuse.  The issues are:

1. Whether defendants are entitled to summary judgment on plaintiffs' Fourth and Fifth Amendment claims that the removal was not justified by exigent circumstances and that the parents should have been afforded a pre-removal hearing where based on the undisputed facts immediate removal was appropriate to address a continued threat of sexual abuse.

2.  Whether defendants are entitled to summary judgment on plaintiffs' First Amendment claims that they acted in retaliation for complaints about District services, and requests for more services, where plaintiffs fail to set forth evidence from which a reasonable jury could conclude that defendants took any challenged action because of those complaints and requests.

3. Whether defendants are entitled to summary judgment on plaintiffs' claim that defendants failed to provide the services mandated by a consent decree entered in another case when plaintiffs were not its intended beneficiaries.

4. Whether defendants are entitled to judgment on plaintiffs' common-law tort claims where plaintiffs failed to plead facts giving rise to plausible claims for relief and failed to present evidence from which a reasonable jury could rule in their favor.

## STATEMENT OF THE CASE

### 1.    The Does' Adoption Of Ann And Oliver, Then Of Wayne And Sara Despite Known Concerns.

Attorneys Robert and Carla Doe are married, long-time residents of the District of Columbia.  JA 393, 483, 526.  They have one biological child, Emma Doe.  JA 289, 484.  They also have served as foster parents to several other children, four of whom they adopted.  JA 289-90, 342, 484.  Oliver was placed with the Does in 1995, when he was one month old.  JA 344, 436, 484.  The Does adopted Oliver in 1996 or 1997.  JA 343.  The Does became foster parents to Ann in 1997, when she was three months old.  JA 344, 436, 484.  They adopted Ann in 1998 or 1999.  JA 344.

In 2000, the Does contacted the Board of Child Care, a licensed child-placing agency under contract with the District's Child and Family Services Agency ("CFSA"), seeking to adopt another child.  JA 285, 292, 485, 487.  The

2

Board of Child Care identified nine-year-old twins, Wayne and Sara, for pre-adoptive placement in the Does' home.  *See* JA 485, 490.

The Board of Child Care had overseen the twins' foster care since its inception, four years earlier.  JA 295, 492.  Before the twins were placed with them, the Does spoke with the children's social worker, foster mother, therapists, teachers, guardian *ad litem*, and birth mother (including her counsel) to gather information about the children.  JA 486-92, 610.

They learned from the twins' foster mother that Wayne would lie and steal, and he did not get along at school.  JA 487.  The children's guardian *ad litem* believed that Wayne was acting out because his current foster parents were not providing him stability and because of his biological mother's unhelpful involvement in his life.  JA 488-89.  In addition, the Does discovered that the twins had been in weekly therapy for a number of years, and their foster parents and a previous guardian *ad litem* had agreed to adopt them, only to change their minds later.  JA 221-22, 487-89, 492.

In addition, Carla Doe came to know Wayne and Sara's history of neglect between birth and five years of age.  JA 221, 294-96, 490-91.  She knew that before coming into care the twins did not have a stable place to live; they were homeless; they did not receive proper medical care; and their mother had neglected to feed them, used drugs, put them in "inappropriate situations" and "unsafe and

3

unhealthy environments," including "drug environments," and stopped caring for them, leaving them with a family friend.[1]  JA 295-96, 488-91.

Because the Board of Child Care handled the twins' case, the Does did not ask CFSA, the District's Department of Mental Health, or the District's Department of Youth Rehabilitation Services ("DYRS") about the twins.  JA 492-94.  There was no evidence that any District employee withheld information sought by the Does or misled the Does regarding the twins' history.  *Compare* Dkt. 189 (Ex. 49-52, 54-55) *with* JA 295-96, 490-91.

The Does chose to become pre-adoptive foster parents to Wayne and Sara in May 2000.  JA 221, 291, 345, 354, 436, 484-85, 521.  At that time, Emma was 10, Oliver was 5, and Ann was 3.  JA 221.  The Does fostered Wayne and Sara for more than a year before their petitions for adoption (which the birth mother contested) were finalized in July 2001.  JA 291, 346, 436, 484-85, 521.  The twins were in therapy for emotional problems from the outset of their placement with the Does.  JA 436, 528, 562.  Before the adoptions were finalized, the Does "struggled with therapy to deal with the emotional issues presented by [Wayne and Sara]," but proceeded anyway.  JA 521.

---

[1]      The Does' assertion here that they did not learn of this information until a December 2004 Freedom of Information Act request is incorrect.  Br. 3 n.1.  This is one of many factual misstatements in the Does' brief.

4

After the adoptions were finalized, the Does received a monthly adoption subsidy; funds for therapy from the District's Crime Victims Compensation Program; and, in the summer of 2003, $8,000 provided by CFSA for Wayne to attend a therapeutic summer camp.  JA 436, 521, 528, 546, 611.  CFSA continued this support even though typically it provided post-adoption services only within the first six months or year of an adoption.  JA 546, 589.

**2.    The Does' Disclosure Of Wayne And Sara's Sexual Abuse Of Ann And Oliver, And Request For Assistance From CFSA.**

According to Ann and Oliver, Wayne and Sara began sexually abusing both of them shortly after the twins moved into the Doe home in May 2000.  JA 508, 518.  Ann stated that the abuse began when she was three, and Oliver testified that the abuse began within a month of the twins' arrival and did not end until the twins were ultimately placed outside the home more than four years later.  JA 508, 518.

It was not until August or September 2004 that Robert and Carla Doe learned that Wayne and Sara (at that point thirteen years old) had been sexually abusing Ann and Oliver for years, and had themselves been sexually abused before their placement with the Does.  JA 222.  Following a therapy session, Sara disclosed to Carla Doe that she inappropriately touched Oliver.  JA 495, 529, 611.  In a subsequent therapy session, Sara disclosed that she had been involved in inappropriate touching with Wayne.  JA 496.  Wayne later disclosed that he had been subjected to inappropriate touching by his birth mother or her associates

5

before his placement in foster care.[2]  JA 496.  By the time of the disclosures, the Does had already placed Wayne outside their home in respite care with a Virginia foster-care provider to address other behavioral issues.  JA 528-30, 571.

On September 27, 2004, the Does contacted CFSA for assistance.  JA 222, 530.  They disclosed in a letter to defendant CFSA Director Brenda Donald Walker that they had recently "learned that [Wayne and Sara] have been molesting our two younger children, [Ann and Oliver], for years."  JA 522, 544.  They explained that while Wayne was in an out-of-home therapeutic placement, Sara was still in the home.  JA 522.  At that time, Wayne's placement and therapeutic services for both Wayne and Sara were being funded by the District's Crime Victims Compensation Program, but the Does indicated to Director Donald Walker that the money was expected to run out shortly.  JA 522.

The Does said that they did not have the financial resources to meet the needs of the children.  JA 522.  Because of this, and disruptions caused by the children, the Does indicated they were "no longer able to continue parenting now four children with such significant needs."  JA 522.  In addition to the adoption subsidy they were receiving, the Does sought "additional financial support for out-of-home, therapeutic respite services, intensive therapy for each family member,

---

[2]    The Does later learned that Wayne and Sara had sexual contact with each other in their previous foster home.  JA 495.

physical modifications to [their] home, transportation assistance, and other needs that m[ight] be identified."  JA 362, 520, 522, 530.

### 3.    CFSA's Investigation Of The Sexual Abuse, Interactions With The Does, And Efforts To Have Wayne And Sara Placed Voluntarily In Its Care.

Two days after receiving the Does' letter, on September 29, CFSA held an internal meeting.  JA 538, 544.  Participants included defendant Sandra Jackson, Administrator for Permanency and Family Resources; Dr. Cheryl Williams, Deputy Director for Clinical Practice; and Sharon Knight, Adoption Services Program Manager.  JA 538, 544-45.

At some point after delivering the September 27 letter, the Does temporarily placed Sara with Carla Doe's mother.  JA 530, 571.  That placement had to be "very brief" because Sara's grandmother "was not in a position to parent anyone for any length of time, in particular anyone with the kind of problems that Sara had."  JA 532.

On October 1, Robert Doe and two of children's therapists met with CFSA representatives Jackson, Knight, and Dr. Tracey Campfield, an agency psychologist.  JA 304-07, 362-64, 437, 531, 538.  They discussed the content of the September 27 letter and the Does' needs.  JA 531-32.

Three days later, on October 4, the Does faxed a letter to Ms. Jackson.  JA 551.  In it, the Does informed CFSA that funding had run out for Wayne's Virginia placement and that there was an "immediate" need for CFSA to either fund that

7

placement or find a new placement for him. JA 551. They also informed CFSA that Sara's grandmother could not keep her much longer, and that she needed a new placement "as soon as possible" that week. JA 552.

On October 5, Ms. Jackson briefed defendants Sara Maxwell, CFSA's Deputy Director, and Terri Thompson Mallet, CFSA's General Counsel, and arranged an internal meeting with Director Donald Walker for the following day. JA 538, 544-45.

The purpose of the October 6 meeting was to develop a plan for placing the Doe children and to ensure that the alleged abuse was properly reported. JA 538. Following that meeting, Dr. Campfield placed a call to the Child Protective Services hotline, which formally triggered an investigation into the allegations of sexual abuse. JA 432-33, 538, 554, 570. Dr. Campfield reported that Wayne and Sara had been sexually abused in the past by their biological mother and others while in her care; Wayne admitted to having sexual contact with Sara and Ann; and Sara had sexual contact with Oliver. JA 433.

The following day, Ms. Jackson, Ms. Thompson Mallet, and Drs. Campfield and Williams participated in a conference call with Robert Doe. JA 437, 532, 538. During that call, CFSA proposed placing Wayne and Sara in a licensed therapeutic CFSA foster home. JA 437, 532, 538. CFSA, however, could not pay for Wayne's transportation or continued therapy with the specific therapist he was seeing

8

because the therapist was not an approved agency provider. JA 549, 582. CFSA asked the Does to sign voluntary placement agreements for Wayne and Sara, authorizing their temporary placement in foster care pending completion of CFSA's investigation. JA 438, 538.

Also on October 7, social worker Delores Williams was assigned to investigate the hotline report. JA 238, 557, 572. She was tasked with investigating the sexual contact among the siblings and ascertaining whether Robert and Carla Doe had provided adequate supervision or had failed to protect the children from abuse by others. JA 433, 573; *see* D.C. Code § 16-2301(9)(A)(i), (ii) (2012 Repl.) (defining a "neglected child" as one whose parents have "failed to make reasonable efforts to prevent the infliction of abuse upon the child" and one "who is without . . . care or control necessary for his or her physical, mental, or emotional health"). Ms. Williams met with the Does in their home on October 7 and spoke with Robert and Carla Doe, as well as the children. JA 160, 238, 369, 434.

After that meeting, Ms. Williams concluded that there were "[o]ne or more signs of present danger" to the children and they faced "moderate" risk, but that the children were not in "immediate danger" because the parents had "provided outside placements for [the] two older children"; "secured [an] alarm system to monitor the younger children's activity at night"; and increased their supervision of the children. JA 559; *accord* JA 238-39. In Ms. Williams's view, the safety plan in

9

place for the children was acceptable.  JA 160.  Her risk assessment was made "early on," soon after visiting the Does' home.  JA 166-67.

On October 8 or 9, Robert and Carla Doe took Ann and Oliver to undergo forensic interviews at Safe Shores, the DC Children's Advocacy Center.  JA 301-04, 370, 372-73, 564.  During her interview, Ann disclosed for the first time that she had also been victimized by Oliver, who remained with her in the Doe home. JA 564.

On October 14, the Does sent a third letter to CFSA, in response to the agency's October 7 request that they voluntarily agree to place Wayne and Sara in foster care.  JA 222, 371.  The Does rejected CFSA's offer.  JA 437-40.  The letter expressed the Does' view that CFSA was responsible for the issues facing the family; memorialized CFSA's offer to place Wayne and Sara in therapeutic foster care; raised a series of concerns about CFSA's offer; and made a counter-proposal that CFSA agree to pay for Sara to attend a private school of the Does' choosing, pay for Wayne to stay in his current placement and continue with his current treatment providers, and pay for therapy for the rest of the family.  JA 438-40.

On October 19, CFSA held an internal meeting with Dr. Williams and defendants Donald Walker, Maxwell, Thompson Mallet, and Child Protective Services Administrator Heather Stowe.  JA 539.  The meeting resulted in a call to Robert Doe to express CFSA's concerns regarding the safety of all four adopted

10

children, and to urge the Does to cooperate with the voluntary placement of Ann, Oliver, Sara, and Wayne during its investigation.  JA 297, 309, 370, 380, 493, 533, 539.  The Does were opposed to placing their adopted children with CFSA and hired attorney Harvey Schweitzer that same day.  JA 180, 381-82, 533.

**4.      CFSA's Removal Of Ann, Oliver, And Sara.**

By October 20, CFSA Director Donald Walker determined that Ann, Oliver, and Sara were in immediate danger and could no longer stay with the Doe family. JA 591-92.  Her decision to remove the children was prompted by CFSA's concern about the Does' historic inability to protect their children during the four years they had abused each other in the Doe home.  JA 546-47, 564-65, 574, 590.  In addition, because the abuse had gone undetected for so long, CFSA was concerned that the Does were not equipped to develop an adequate safety plan to protect Ann and Oliver and had not in fact done so.  JA 564-65, 574, 590-91.  Moreover, CFSA had no control over the safety plan that was in place and could not ensure that it functioned properly.  JA 574.  In particular, there was a concern that Ann and Oliver would come into contact with Sara at their grandmother's home.  JA 590. More significantly, there were concerns that Wayne and Sara could return to the Doe home given the Does' repeated assertions that there was no funding for Wayne's placement and Sara's grandmother could not continue to care for her.  JA 548, 564-65, 574.  Finally, there was uncertainty about what the Does knew about

the abuse, and there was a need to separate the children to gather information.  JA 574.

Mr. Schweitzer contacted CFSA at 2:00 p.m. on October 20, but efforts to negotiate were not successful.  JA 182, 310-11, 390, 392, 533.  The Does would not agree to place the children in foster care.  JA 390, 534, 539-40.  Ms. Thompson Mallet advised the Does that, given the agency's determination, it would be forced to involve the Metropolitan Police Department if the Does refused to allow CFSA to remove the children from their home that day.  JA 382-83, 385-86, 390, 533.

Defendant social workers Rebekah Philippart and Daphne King were assigned to remove Ann and Oliver from the Does' home and to notify the Does that they were to appear in court the following day for a hearing.  JA 187, 194, 596-97.  Neither Ms. Philippart nor Ms. King was involved in the removal decision.  JA 198-99, 202-05, 427, 596-97.  While the Does objected to the children's removal, Ms. Philippart noted that this was commonplace.  JA 194, 199, 203-04, 207.  Ms. Philippart and Ms. King had no reason to believe that the removal decision was unethical or illegal.  JA 198, 202.  Rather, it was Ms. Philippart's understanding that the decision was made because there was a concern about imminent danger to the children.  JA 199, 201, 497, 598.

Ms. Philippart and Ms. King arrived at the Doe home at 9:00 p.m.  JA 182, 223, 318, 390.  The Does allowed Ms. Philippart and Ms. King to remove Ann and

12

Oliver in lieu of involving the police.  JA 182, 312-13, 394, 398, 497, 535.  CFSA also removed Sara from her maternal grandmother's home.  JA 404, 536.  Wayne remained in his placement in Virginia.  JA 404, 536, 540.

Ms. Philippart and Ms. King provided the Does with notice to appear in court the next day.  JA 400, 442, 535.  It stated that the children were being taken into custody due to "imminent danger."  JA 442.  Carla Doe understood that CFSA believed the children were in imminent danger at the time of removal.  JA 314.

As part of CFSA's standard intake procedure, Ann and Oliver were taken to a hospital for a physical examination.  JA 197, 509-10, 516, 598.  Ann explained that the examination lasted only about ten minutes and was not really different from any previous medical exam, and that no one hurt her.  JA 510-11.  Afterward, Ann was taken to her grandmother's home, to whom CFSA had granted a temporary kinship foster care license.  JA 510-11, 539.  Sara and Oliver were placed in CFSA foster homes.  JA 517.

At court the next morning, the Does were told that the neglect charges had been "no papered."  JA 183, 406, 498, 536.  Because no neglect petition was filed,

13

the hearing was canceled.  JA 183, 406, 498, 536; *see* D.C. Code § 16-2305(a) (2012 Repl.).[3]

That same day, the Does entered into an agreement to voluntarily place Sara in foster care.  JA 406, 536.  Oliver returned home later that day, less than 24 hours after his removal, and Ann was not required to stay in her foster placement with her grandmother.  JA 406, 536.

On December 3, 2004, CFSA completed its investigation and the case was closed with a disposition of "unfounded."  JA 452.  CFSA ultimately concluded that there was insufficient evidence to support a finding of neglect based on a failure-to-protect or lack-of-parental-supervision theory.  JA 565.

---

[3]      Despite what the Does claim on appeal, CFSA made no allegation that the Doe parents sexually abused their children.  Br. 8, 48, 52.  While the CFSA Child Abuse & Neglect Complaint Referral Form reflected an "allegation" of sexual abuse had been made in the case and identified Robert and Carla Does as the "alleged abuser," the Statement of Facts accurately recounted that "the children were sexually abused in the past by their biological mother . . . and that she prostituted them to support her drug habit."  JA 44.  In addition the form indicates that Wayne "admitted to having sex with [Sara] as well as his adoptive sister, [Ann]"; it was "reported that [Sara] had sexual contact with [Oliver]"; and the interviews at the Children's Advocacy Center revealed that "all of the children have been involved with sexual activity with each other for a length of time."  JA 444.  There was no assertion that Robert or Carla Doe sexually abused the children.  Only parental figures can be charged with neglect, however, so Ms. King explained that the complaint referrals listed the parents as alleged abusers for administrative purposes because non-chargeable minors were believed to have committed the abuse.  JA 191.  In fact, Robert and Carla Doe were under investigation for failing to protect their children from those abusers and for failing to provide proper parental care and control.  JA 433, 573.

**5.    Services For Wayne And Sara And Their Subsequent Juvenile Delinquency Proceedings.**

In January 2005, CFSA entered into a memorandum of understanding with the Department of Mental Health to provide Wayne and Sara with services.  JA 223.   Wayne and Sara were subsequently subjected to juvenile delinquency proceedings for sexual abuse and determined to be delinquent in June 2005.  JA 377, 405, 536-37; Dkt. 188 (Ex. 21).  The Does were advised in March 2005 that CFSA would no longer pay for services for Wayne and Sara beginning in November 2005.  JA 223; Dkt. 188 (Ex. 22).

DYRS agreed, however, to provide services if the twin's probation was revoked and they were committed to the agency.  JA 223.  Each had probation revoked in the fall of 2005, and they remained committed to DYRS for about a year and a half, until May 22, 2007.[4]  JA 223, 412, 465-66, 600, 603.  During this period, the Does had numerous exchanges with the agency regarding the services that Wayne and Sara were being provided.  JA 334-38, 410-20; Dkt. 188, 189 (Ex. 27-34).  In the Does' view, DYRS was not providing meaningful rehabilitative services.  JA 411.

On May 4, 2007, the Does sent a letter to the agency indicating that Wayne and Sara had expressed a "clear desire not to return home" and that the Does were

---

[4]     During that time, the Does continued to receive an adoption subsidy for the twins.  Dkt. 189 (Ex. 33 at 6).

"open to each of them being adopted by an appropriate family." JA 463. The Does hoped that if foster parents were not willing to adopt, "an appropriate plan c[ould] be developed to identify possible adoptive homes." JA 463-64. The Does were willing to "legally consent to an adoption" so that Wayne and Sara "would be on the same footing regarding adoption recruitment as children who are legally free for adoption." JA 464.

On May 8, 2007, DYRS notified the Superior Court that it was going to close the twins' delinquency cases on their 16th birthday, May 22, 2007. JA 465-66. The Does received a copy of that notice on May 13. JA 224. On May 14, the Does filed an emergency motion for a stay and to modify the twins' disposition. JA 467-79. At that point, the Does could not safely parent Wayne and Sara in their home with other children there. JA 332, 338, 500-01. According to Carla Doe, their other children were "still afraid to death of these other two children." JA 332, 500. Moreover, there was no available relative placement, and the Does did not have money for the twins' care. JA 332, 338-39, 500-01.

The Does did not receive a ruling from the court before the twins' scheduled release date. JA 480. Thus, on May 21, 2007, the Does relinquished custody of Wayne and Sara to CFSA. JA 224, 331, 480, 500.

16

Non-defendant DYRS employee Mary Phillips made the decision to close the twins' delinquency cases. P. Ex. 33 at 5. She explained that the cases were closed because the agency:

> had provided the services and because the children really were not appropriately committed to us. And the only reason they were committed was that we were basically bankrolling their housing because the parents wouldn't allow them to come home. They had actually been on probation, were succeeding on probation, and under normal circumstances, never would have been committed.
>
> It was a first offense for each and under normal circumstances, those children do not get committed. But when the parents refuse to allow them to come home—and I believe CFSA or [the Department of Mental Health], another agency, had been providing and paying for the housing and they said we're not going to do [it] . . . .

Dkt. 189 (Ex. 33 at 5).

## 6. Proceedings In The District Court.

The Does filed suit against defendants on May 27, 2005, shortly before the twins were adjudicated delinquent. Dkt. 3. They filed a 24-count amended complaint on December 14, 2007. JA 42-85. The district court dismissed a portion of those claims on defendants' motion to dismiss on March 7, 2008. JA 133-34. Then, following discovery, the Does filed a motion for summary judgment and defendants filed a motion judgment on the pleadings and motion for summary judgment. Dkt. 182, 186.

The district court granted defendants' motions on August 1, 2013. JA 242-85. The district court rejected the Does' Fourth Amendment claim challenging Ann

and Oliver's removal without a court order because defendants had reason to believe that the Doe children were in immediate danger and that removing them in the face of this exigency was necessary.  JA 254.  The district court rejected the Does' Fifth Amendment due process claim for similar reasons: because no reasonable jury could find that defendants lacked a reasonable basis to believe the children were in immediate danger, failure to provide a pre-removal hearing did not violate due process.  JA 259-60.  The district court also found that defendants were entitled to qualified immunity on the Does' Fourth and Fifth Amendment claims for the additional reason that it would not have been clear to defendants that their actions were unlawful.  JA 283.

As for the Does' claim that defendants retaliated against them in violation of the First Amendment when they requested or complained about services, the district court found that the Does had not established a nexus between their protected activities and the allegedly retaliatory actions.  JA 263.  The district court also rejected the Does' attempts to enforce the *LaShawn A. v. Kelly*, 887 F. Supp. 279 (D.D.C. 1995) consent decree, finding that they were not intended beneficiaries of that decree with the right to enforce it in a separate cause of action. JA 279-80.

The district court also found that defendants were entitled to judgment as a matter of law on the Does' four tort claims.  The court found no evidence to

18

support the Does' claim that Ann and Oliver were assaulted and battered during their removal.  JA 264-65.  The court found no invasion of the Does' privacy when the children were removed, concluding that an ordinary person in the Does' position could not have reasonably expected that defendants would be excluded from their home given the immediate danger the children faced.  JA 276-77.  The court found insufficient evidence to demonstrate that defendants engaged in extreme and outrageous conduct resulting in the intentional infliction of emotional distress.  JA 266-67.  Finally, the court found that there was no abuse of process in that the Does produced no proof that the legal system was used to accomplish an unintended end.  JA 274.

## STANDARD OF REVIEW

This Court reviews the grant of a Fed. R. Civ. P. ("Rule") 12(c) motion for judgment on the pleadings *de novo*.  *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992).  Under Rule 12(c), a party is entitled to judgment on the pleadings if "no material fact is in dispute and it is entitled to judgment as a matter of law."  *Id.* (quotation marks omitted).  When considering a motion for judgment on the pleadings, the Court accepts as true the allegations in the complaint and draws all reasonable inference in favor of the nonmoving party.  *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002).  Where a Rule 12(c) motion is the functional equivalent of a Rule 12(b)(6) motion to dismiss for failure

19

to state a claim for relief, the pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), apply. *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 129-30 (D.C. Cir. 2012).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Twombly*, 550 U.S. at 555. "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

This Court also reviews a summary judgment determination *de novo*. *Tate v. District of Columbia*, 627 F.3d 904, 908 (D.C. Cir. 2010). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if its resolution might affect the outcome of the case. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In determining whether summary judgment is appropriate, this Court neither weighs the evidence nor determines the credibility of witnesses. *Id*. at 249. Instead, the Court views the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in his favor. *Id*. at 255. In doing so, the Court "will not ignore facts in the record merely because they are unfavorable to [the non-moving party]; [the non-moving party] gets the benefit of the doubt only if the record contains competent evidence on both sides of a factual question." *Patel v. Allstate Ins. Co*., 105 F.3d 365, 367 (7th Cir. 1997). A plaintiff opposing summary judgment may not rest upon mere allegations, but must affirmatively set forth specific evidence showing a genuine issue for trial. *Anderson*, 477 U.S. at 256. "The possibility that a jury might speculate in the plaintiff's favor is insufficient . . . ." *Haynes v. Williams*, 392 F.3d 478, 485 (D.C. Cir. 2004).

## SUMMARY OF ARGUMENT

This Court should affirm the district court's judgment. Defendants are entitled to judgment as a matter of law with respect to each of plaintiffs' claims.

1. Defendants are entitled to summary judgment on plaintiffs' Fourth Amendment and Fifth Amendment claims for several reasons. First, there was no

constitutional violation. Ann and Oliver Doe's October 20, 2004, removal from their home was justified by exigent circumstances. Defendants had a reasonable basis to believe that, after enduring four years of sexual abuse in their home by their siblings, they were in imminent danger of abuse given their parents' historic inability to protect them coupled with the immediate possibility that their abusers would return to their home. Thus, the children's removal without a court order or a pre-deprivation hearing did not violate plaintiffs' Fourth and Fifth Amendment rights.

Second, defendants Sarah Maxwell, Sandra Jackson, Heather Stowe, and Terri Thompson Mallett are entitled to judgment because they cannot be held vicariously liable for the actions of others. Here, the record shows that it was CFSA Director Brenda Donald Walker who made the decision to remove Ann and Oliver Doe from their home and that it was social workers Rebekah Philippart and Daphne King who took custody of the children. The remaining individual defendants were not involved in the allegedly unconstitutional actions.

Third, the individual defendants are entitled to qualified immunity. Defendants had numerous reasons to believe that Ann and Oliver were in imminent danger of abuse. A reasonable official in defendants' position would not have believed that the decision to remove the children without a court order in these circumstances would be unlawful.

2. Defendants are entitled to summary judgment on plaintiffs' First Amendment retaliation claim.  Plaintiffs have not carried their burden of producing evidence from which a reasonable jury could find that Ann and Oliver Doe would not have been removed from their home but for their parents' request for CFSA services.  There is no direct evidence, and plaintiffs' circumstantial evidence is insufficient.  Temporal proximity alone does not give rise to the inference of retaliation; the removal was justified by exigent circumstances; and there was no admissible evidence of hostility toward the Does' request for services.  Instead, the evidence shows that the children's removal would have occurred even in the absence of those requests.  Likewise, the Does' claim that closure of Wayne and Sara's delinquency cases was retaliatory fails because there is no evidence that the legitimate explanation for that decision was a pretext for retaliation.

In addition, the individual defendants are entitled to judgment as a matter of law because they were not involved in Ann and Oliver's removal or the closure of Wayne and Sara's cases and they were unaware of the Does' protected activity.  As for the Does' claim regarding closure of the twins' delinquency cases, the District cannot be liable because the Does have not identified a District custom or policy that was the moving force behind the alleged violation, nor was the decision to close the cases made by a District policy maker.

23

3.  The defendants are entitled to summary judgment on the Does' claim that the District violated the *LaShawn A.* consent decree by failing to provide post-adoption services to the family.  The Does have not demonstrated that they were intended beneficiaries of the consent decree—beneficiaries with the right to enforce the consent decree.  The four corners of the consent decree do not support their claim otherwise.  Moreover, even if intended beneficiaries, the Does were not entitled to seek enforcement of the consent decree in a separate 42 U.S.C. § 1983 suit.  Finally, the Does have not demonstrated that the service they sought were services guaranteed by the consent decree.

4.  Defendants are entitled to judgment on each of plaintiffs' common-law tort claims.

There are no facts or evidence supporting the Does' claim that Ann and Oliver were assaulted and battered during their removal.  There is no allegation or evidence that any defendant made physical contact with the children, let alone intentionally harmful or offensive contact, or intentionally caused them apprehension of imminent physical harm.

Because removal of the Ann and Oliver was justified by exigent circumstances, the Does' invasion of privacy claim also fails.  The Does could not have reasonably expected that defendants would be excluded from their home after defendants concluded that the children faced imminent danger of abuse.

24

Plaintiffs have not pled or presented sufficient evidence in support of the claim of intentional infliction of emotional distress. A reasonable jury could not find from the conduct about which they complain that defendants' actions were extreme and outrageous and they suffered severe emotional distress.

Finally, plaintiffs' abuse-of-process claim fails because the neglect investigation was not used to achieve a collateral purpose. Instead, the investigation was conducted to determine if Ann and Oliver were neglected children, not in an effort to compel the Does to do take some other action they could not legally and regularly be required to undertake.

## ARGUMENT

### I.  Defendants Are Entitled To Summary Judgment On Plaintiffs' Fourth And Fifth Amendment Claims.

This Court should affirm the district court's determination that defendants are entitled to summary judgment on the Does' Fourth and Fifth Amendment claims. A *de novo* review of the record demonstrates that there was no constitutional violation; many of the named defendants were not involved in the allegedly unconstitutional conduct; and the individual District defendants are entitled to qualified immunity.[5]

---

[5]     The Does argue repeatedly that reversal is warranted because of district court error. Br. 17, 21, 26, 33, 39-40, 44, 46-47, 50. Given the *de novo* standard of review, the district court's purported errors are immaterial and provide no basis

### A. The Does' Fourth and Fifth Amendment rights were not violated by the District's removal of children from an environment of sexual abuse.

Exigent circumstances supported the children's immediate removal on October 20, 2004, without a court order or a pre-removal hearing. There is no merit to Ann and Oliver Doe's contention that their removal violated their Fourth and Fifth Amendment rights. Br. 15-21, 25-26.

The Fourth Amendment's proscription against unreasonable seizures applies to the removal of children from their home by social workers. *Xiong v. Wagner*, 700 F.3d 282, 289 (7th Cir. 2012). In such circumstances, a seizure is reasonable if it is made pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that a social worker has reason to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home. *Id.*; *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 429 (5th Cir. 2008).

The Fourth Amendment's "central requirement" of reasonableness, *Texas v. Brown*, 460 U.S. 730, 739 (1983), is measured objectively by examining the totality of circumstances surrounding the intrusion, *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). "[W]e do not look at the subjective motivations of an officer when

---

for reversal. *See Tilton v. Richardson*, 6 F.3d 683, 688 (10th Cir. 1993). In any event, as described below, the Does themselves err in attacking the district court's analysis.

examining the objective basis for a finding of exigent circumstances." *United States v. Schmidt*, 700 F.3d 934, 938 (7th Cir. 2012). Instead, the question is whether a reasonable social worker could have believed that the children faced an immediate threat of abuse given the facts know to her. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 927 (7th Cir. 2011); *see also In re Sealed Case 96-3167*, 153 F.3d 759, 766 (D.C. Cir. 1998).

This inquiry is flexible and involves consideration of numerous factors, none of which standing alone is dispositive. *Gates*, 537 F.3d at 429; *see Doe v. Kearney*, 329 F.3d 1286, 1295 (11th Cir. 2003). Those factors include: the nature of the abuse, including its severity, duration, and frequency; the strength of the evidence supporting the allegation of abuse; the risk that the parent will flee with the child; whether there are less extreme alternatives to removal; whether the child will be harmed by the removal; and whether there is sufficient time to secure a court order. *Gates*, 537 F.3d at 429; *see Kearney*, 329 F.3d at 1297 ("We agree that the sole focus should not be on whether there is time to obtain a court order.").

The Does' Fifth Amendment procedural due process claim turns on the same considerations. "Generally, absent exigent circumstances, due process requires a hearing before state officials may remove a child from her home." *Batten v. Gomez*, 324 F.3d 288, 295 (4th Cir. 2003). "Faced with emergency circumstances which pose an immediate threat to the safety of a child, the state may temporarily

deprive a parent of custody without parental consent or a court order." *Arredondo v. Locklear*, 462 F.3d 1292, 1298 (10th Cir. 2006) (internal quotation marks omitted); *accord Kearney*, 329 F.3d at 1293.

Here, exigent circumstances supported the removal of Ann and Oliver without a court order or pre-deprivation hearing, and thus there was no violation of either the Fourth or the Fifth Amendment.  The undisputed facts show that before removing Ann and Oliver from their home on October 20, 2004, CFSA conducted a thorough investigation.  Agency personnel met and spoke with Robert and Carla Doe on several occasions, as well as speaking with the children.  JA 160, 297, 304-07, 309, 362-64, 369, 380, 390, 437, 493, 531-34, 538-40.  There was no rush to judgment, and the agency endeavored to work with the Does to minimize the risk of harm to the children.

From its investigation, CFSA learned: (1) Wayne and Sara had been sexually abusing Ann and Oliver in their home over a significant period of time—four years—unbeknownst to Robert and Carla Doe, who, as a result, were unable to protect Ann and Oliver; (2) Ann had also been sexually abused by Oliver, who remained in the Doe home with Ann; (3) funding for Wayne's out-of-home placement expired on September 30, and he was in need of an "immediate" placement elsewhere, in lieu of returning home; (4) Sara's maternal grandmother, with whom she had been placed by the Does, could no longer care for her, and

28

Sara thus had an immediate need for another out-of-home placement lest she return home; (5) the Does were financially unable to fund out-of-home placements for Wayne and Sara; and (6) the Does were unwilling to voluntarily place Wayne, Sara, Ann, or Oliver with CFSA. JA 382, 439-40, 522, 546-48, 551-52, 564-65, 574, 590-91. Based on this information, CFSA reasonably questioned (1) the Does' ability to protect Ann and Oliver within their home by developing an adequate safety plan; (2) its own ability to ensure that Ann and Oliver remained safe in their home where it had no control over the implementation and enforcement of the Does' safety plan; and (3) whether Ann and Oliver would come in contact with Wayne and Sara, particularly if the twins returned to the Does' home due to the lack of available out-of-home placements for them. JA 546-48, 564-65, 574, 590-91. Indeed, as time passed, Ann and Oliver faced an ever-increasing risk that their abusers would be forced to return home due to their parents' inability to provide stable out-of-home placements for them and their unwillingness to voluntarily commit Wayne and Sara to CFSA's care. Finally, CFSA was uncertain about what Robert and Carla Doe did and did not know about the abuse. JA 574. From the totality of this information, a reasonable social worker would have believed that the children faced an immediate threat of abuse when they were removed from the home on October 20, 2004. *See Arredondo*, 462 F.3d at 1299-1301; *Xiong*, 700 F.3d at 290; *Kearney*, 329 F.3d at 1298-99.

29

In seeking reversal, the Does assert in a conclusory fashion that there was no exigency. Br. 17. They cite no authority supporting the proposition that the facts known to CFSA did not rise to the level of an exigency. Rather, they simply ignore much of the information available to CFSA when the removal decision was made. Indeed, in referencing the "critical" facts, the Does make no mention of the undisputed evidence outlined above, which included the immediate possibility that Wayne and Sara would be forced to return home. Br. 17-18. The Does themselves recognized the exigency of the situation by requesting "emergency support" from CFSA to assist their family with the "crisis" it was experiencing. JA 222, 437, 520. It was "clear" to the Does that "immediate steps" were needed to "make everyone in [their] family feel safe." JA 522. In particular, there was an "immediate" need to secure Wayne's out-of-home placement and that Sara was in need of a similar placement "as soon as possible" during the week of October 4. JA 551-52. Yet the Does refused to accept the services CFSA offered. JA 182, 383, 390, 437-40, 533. Given the threat that Wayne and Sara posed to Ann and Oliver, coupled with the Does' historic inability to protect Ann and Oliver, CFSA reasonably concluded that exigent circumstances warranted Ann and Oliver's removal from the Does' home.

It does not matter that, as the Does emphasize, the agency removed Ann and Oliver a few weeks after learning of the alleged abuse. Br. 18, 24. This time reasonably was spent investigating and deciding on the best course of action.

30

Moreover, even if that length of time suggested that agency decision-makers did not believe there was an emergency, the Fourth Amendment analysis is objective, so it does not matter what any particular person subjectively believed.[6]  *Schmidt*, 700 F.3d at 938.  And any thought that the children should have been removed sooner would not suggest that the circumstances facing CFSA at the time of removal were any less exigent; it could not be that an official's failure to seek removal quickly enough would prohibit the District from acting later to address an emergency.

Similarly, the fact that the neglect charges were subsequently "no papered" has no bearing on the question whether there were exigent circumstances supporting the children's removal.  *See Proescher v. Bell*, 966 F. Supp. 2d 1350, 1368 n.16 (N.D. Ga. 2013) ("An order of *nolle prosequi* does not, by itself, establish a lack of probable cause."); *Sundeen v. Kroger*, 133 S.W.3d 393, 396 (Ark. 2003) (same); *Anton v. Police Ret. Sys. of St. Louis*, 925 S.W.2d 900, 907 (Mo. App.  1996) (same).

Because there was no constitutional violation, all defendants are entitled to summary judgment on the Does' Fourth and Fifth Amendment claims.

---

[6]     Thus, it is immaterial that Ms. Williams did not agree that Ann and Oliver Doe were in imminent danger.  Br. 4, 18; *see also Arredondo*, 462 F.3d at 1300-01.

31

**B.    Defendants Sarah Maxwell, Sandra Jackson, Heather Stowe, and Terri Thompson Mallett are entitled to judgment as a matter of law for the additional reason that the Does have not pled facts or produced evidence demonstrating that they personally violated the Does' Fourth and Fifth Amendment Rights.**

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead [and prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *accord Elkins v. District of Columbia*, 690 F.3d 554, 564 (D.C. Cir. 2012). Here, the Does failed to plead sufficient facts to state a claim to relief that is plausible on its face and from which a rational trier of fact could conclude that defendants Maxwell, Jackson, Stowe, and Thompson Mallett violated their Fourth and Fifth Amendment rights, nor did they produce any summary judgment evidence that would support such a finding.[7]  Instead, the record shows that it was CFSA Director Donald Walker who made the decision to remove Ann and Oliver Doe from their home and that it was social workers Philippart and King who took custody of the children.  JA 187, 194, 198-99, 202-05, 592, 597-97.  Thus, there is no basis to find defendants Maxwell, Jackson, Stowe, or Thompson Mallett liable for a Fourth or Fifth Amendment violation.

---

[7]    The Does do not challenge the district court's dismissal of Mayor Fenty as a party.  JA 281-82.

### C.      The individual defendants are entitled to qualified immunity.

Even if this Court were to find a Fourth or Fifth Amendment violation, the individual defendants would be entitled to summary judgment as the Does have not overcome their assertions of qualified immunity.   "To overcome a claim of qualified immunity, plaintiffs must show both that an official 'violated a constitutional right' and that 'the right was clearly established' at the time of the violation."  *Johnson v. District of Columbia*, 734 F.3d 1194, 1201-02 (D.C. Cir. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 2001-01 (2001)).[8]   Qualified immunity shields government "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The dispositive question is "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.   Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

---

[8]      The Court may consider the two steps of the qualified immunity analysis in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In arguing against qualified immunity on the Fourth and Fifth Amendment claims, the Does incorrectly point to District of Columbia statutory law, which they say makes clear that, absent a court order, an official should remove a child only based on reasonable grounds for perceiving immediate danger. Br. 41 (citing D.C. Code § 16-2309(a)(1), (3) (2012 Repl.)). The difficulty with the Does' argument is that the parameters of the Fourth and Fifth Amendment are not defined by reference to District statutes. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008); *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006). Instead, this Court looks to decisions of the Supreme Court and this Court, as well as those from other courts reflecting a consensus view to determine whether constitutional law is clearly established. *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011).

Moreover, even if the Does are correct that it was clearly established in October 2004 that exigent circumstances were needed to justify warrantless seizure of children from their home, "[t]he statement of the right at this level of generality . . . is of little help in determining the reasonableness" of defendants' actions. *Batten*, 324 F.3d at 296. In assessing whether a right is clearly established, a court does not focus on the right at its most abstract level, but rather at the level of its application to the conduct being challenged. *Id.*; *accord Taylor v. Reilly*, 685 F.3d 1110, 1113-14 (D.C. Cir. 2012). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is

34

doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). There need not be a case directly on point, but precedent must have placed the constitutional question "beyond debate." *al-Kidd*, 131 S. Ct. at 2083. Thus, the question here is whether it would have been clear to a reasonable official in defendants' position that removing the children without a court order was unlawful. *Elkins*, 690 F.2d at 568.

Even assuming the individual defendants' conduct was unlawful, that unlawfulness would not have been clear. As explained, defendants had numerous reasons to believe that Ann and Oliver were in imminent danger of abuse. A reasonable official in the defendants' position would not have believed that the decision to remove the children without a court order in these circumstances would be unlawful. The Does do not cite any decision with facts comparable to those here, let alone a binding decision or a consensus from other courts.

Defendants Philippart and King are further entitled to qualified immunity because they reasonably relied on a supervisory determination that imminent danger justified removal. JA 199, 201, 497, 598. "[S]ocial workers, like police officers, are entitled to rely upon information they receive from other officers, and are insulated from civil liability in the event the information relied upon is defective." *Andrews v. Hickman Cnty.*, 700 F.3d 845, 860 (6th Cir. 2012) (internal quotation marks and alterations omitted); *accord Elkins*, 690 F.3d at 568-69.

35

**II.     Defendants Are Entitled To Summary Judgment On The Does' First Amendment Retaliation Claims.**

This Court should affirm the district court's determination that defendants are entitled to summary judgment on the Does' First Amendment retaliation claims.   A *de novo* review of the record demonstrates that the Does' First Amendment rights were not violated; many of the named District defendants were not involved in the allegedly unconstitutional conduct; and the District cannot be held liable for the actions of its employees on a *respondeat superior* theory.

**A.     The Does' First Amendment rights were not violated because they established no causal connection between their requests for services and the District's actions.**

There is no merit to the Does' claim that their First Amendment right to petition the government for redress of their grievances was violated when (1) CFSA allegedly removed Ann and Oliver from their home on October 20, 2004, in retaliation for their request that the agency provide post-adoption services to the family and (2) DYRS allegedly closed Wayne and Sara's delinquency cases on May 22, 2007, in retaliation for their requests that the agency provide rehabilitative services to Wayne and Sara.   Br. 28-32.   To prevail on a claim of unlawful retaliation in violation of the First Amendment, a plaintiff must establish three elements: (1) he engaged in a constitutionally protected activity; (2) he suffered an adverse action such that the retaliatory conduct would likely deter a person of ordinary firmness from engaging in that protected activity; and (3) there is a casual

36

relationship between the retaliatory action and the protected activity. *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Scheffler v Molin*, 743 F.3d 619, 621 (8th Cir. 2014).

For purposes of this appeal, defendants do not dispute that the Does presented sufficient evidence to overcome summary judgment as to the first and second elements of their claims.[9]  With respect to the third element, the causal connection inquiry asks whether the defendants were subjectively motivated to take an adverse action because of the protected activity. *Smith*, 532 F.3d at 1278. Most courts resolve this issue under a burden-shifting formula. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Under this framework, once the plaintiff meets his burden of demonstrating that his protected conduct was a motivating factor for the adverse action, the burden of production shifts to the defendant. *Smith*, 532 F.3d at 1278.  If the defendant can show that he would have done the same thing in the absence of the protected activity, he is entitled to prevail on his motion for summary judgment. *Id.*  Thus, "the plaintiff must show that the

---

[9]    The second element, whether the allegedly retaliatory acts would likely deter a person of ordinary firmness from engaging in the protected activity, incorporates an objective standard. *Smith*, 532 F.3d at 1276; *Scheffler*, 743 F.3d at 621.  The Does' assertion that they were personally chilled is thus immaterial.  Br. 30.  It is also inaccurate.  Following Ann and Oliver's removal in October 2004, the Does repeatedly petitioned CFSA for services. *See*, *e.g.*, Dkt. 188 (Ex. 22); JA 227-29.

retaliatory motive was the but-for cause of the harm." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007).

Here, the District demonstrated that its motivation for removing Ann and Oliver was its belief that they were in imminent danger of abuse.  The Does, however, contend that the asserted imminent threat of sexual abuse to Ann and Oliver was a pretext for retaliation for three reasons.

First, the Does contend that the temporal proximity between the children's removal and their requests for services was so close as to give rise to an inference that retaliation was the real motive behind the removal decision.  Br. 33-35.  They go so far as to assert that "temporal proximity between a protected act and adverse action can establish the causation element."  Br. 33.  This extreme position that temporal proximity *always* ensures that a claim can reach a jury is incorrect. "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage."  *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013); *accord Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293, (10th Cir. 2013). Instead, it is but one factor to be considered.

Second, the Does contend that the District's explanation for the removal was a pretext because there was no basis in fact for the claim that Ann and Oliver were in imminent danger.  Br. 35.  While an "[a]dverse action that cannot be defended by any non-retaliatory explanation provides a basis for a reasonable jury to find

38

that the defendant acted with improper motives," "[t]his is not such a case." *Kilpatrick*, 499 F.3d at 768. As discussed in the previous point, exigent circumstances provided a sound basis for removing Ann and Oliver from their home.

Third, the Does contend that defendants expressed "hostility" toward their requests for post-adoption services for the children, giving rise to an inference that those requests were the real reason for the removal. Br. 35-37. But they cite nothing in the record to support this. Br. 35-37. Carla Doe had no first-hand knowledge of any hostility. JA 286-340. Likewise, Robert Doe, who met and spoke with defendants on several occasions, did not indicate that he experienced "hostility" in response to the family's requests for services. JA 341-431. To the contrary, when asked about the tenor of the October 1, 2004, meeting he described it as "somber," not "hostile." JA 365. He said he did not remember anyone being "rude," but indicated that one participant may have been "defensive." JA 365-66. He described Sandra Jackson as "trying to come up with a plan" during that meeting and noted it concluded with his understanding that CFSA was considering the matter and would get back to him. JA 367-68. On October 14, 2004, Robert Doe expressed his appreciation for CFSA's "offer of assistance" and thanked Ms. Jackson and the team she had assembled "for the efforts to date on" his family's

behalf.  JA 438, 440.  The record simply does not support the Does' assertion here that their requests for post-adoption services were met with "hostility."

On this record, it is clear that CFSA would have proceeded to remove Ann and Oliver on October 20, 2004, notwithstanding the Does' request for post-adoption services for the family.  No rational trier of fact could conclude that the Does' request for post-adoption services was the "but for" cause of the children's removal.  Thus, defendants are entitled to summary judgment on the Does' claim of First Amendment retaliation by CFSA.

Defendants similarly are entitled to summary judgment on the Does' claim regarding DYRS's decision to close the twins' delinquency cases.  The Does rely solely on evidence of temporal proximity to argue that Mary Phillips's legitimate explanation for closing the twins' delinquency cases was a pretext for retaliation. Br. 37-38.  As discussed, however, temporal proximity alone is insufficient to establish causation at the pretext stage.  *Zann Kwan*, 737 F.3d at 847; *Lobato*, 733 F.3d at 1293.  Thus, no reasonable jury could return a verdict in favor of the Does on this claim of retaliation either.

**B.    Defendants Sarah Maxwell, Sandra Jackson, Heather Stowe, and Terri Thompson Mallett are entitled to judgment as a matter of law for the additional reason that the Does have not pled facts or produced evidence demonstrating that they personally violated the Does' First Amendment rights.**

As discussed, vicarious liability is inapplicable to § 1983 suits, and a plaintiff must plead and prove that each defendant, through her own individual actions, has violated the Constitution.  *Iqbal*, 556 U.S. at 676.  Here, the Does failed to plead sufficient facts to state a claim to relief that is plausible on its face and from which a rational trier of fact could conclude that defendants Maxwell, Jackson, Stowe, and Thompson Mallett violated their First Amendment rights, nor did they produce any summary judgment evidence that would support such a finding.  Instead, again, the record shows that it was CFSA Director Donald Walker who made the decision to remove Ann and Oliver Doe from their home; it was social workers Philippart and King who took custody of the children; and it was Mary Phillips (who is not a defendant) who decided that the twins' delinquency cases should be closed.  JA 187, 194, 198-99, 202-05, 592, 597-97; Dkt. 189 (Ex. 33 at 5).  Thus, there is no basis to find defendants Maxwell, Jackson, Stowe, or Thompson Mallett liable for a First Amendment violation.

**C.    Defendants Rebekah Philippart and Daphne King are entitled to judgment as matter of law because they did not even know of the Does' exercise of their First Amendment rights.**

To prove unlawful retaliation, a plaintiff must show that the defendant had knowledge of the plaintiff's protected activity. *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011). It is undisputed that social workers Philippart and King became involved in the Does' case after the decision to remove Ann and Oliver was made and their only role was to effectuate that removal. JA 198-99, 202-05, 367, 394, 427, 596-97. There is no evidence that they had knowledge of the Does' request for post-adoptive services, and thus could not have retaliated by removing the children in response to those requests. Moreover, they have no connection to the subsequent decision by DYRS to close the twins' delinquency cases. Thus, they are entitled to judgment as a matter of law for these additional reasons.

**D.    The District is entitled to judgment as a matter of law on the Does' claim that DYRS's closing of the twins' delinquency cases was in retaliation for the exercise of the Does' First Amendment rights.**

The District is not liable of the actions of its employees under 42 U.S.C. § 1983 on a theory of *respondeat superior*. *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997). Instead, it is liable only for constitutional torts that arise from actions taken pursuant to an official municipal policy. *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). The municipal policy must be the "moving force" behind the constitutional violation. *Baker v. District of*

42

*Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). There are several ways a municipality can set a policy for which it may be liable:

> the explicit setting of a policy by the government that violates the Constitution; the action of a policy maker within the government; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom"; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Id.* (citations omitted).

Here, it appears that the Does contend that the District is liable for DYRS's decision to close the twins' delinquency cases because a District policy maker was responsible for the decision. They do not point to an explicit policy, a particular custom, or deliberate indifference on the part of District policy makers, nor do they offer any support for these theories of municipal liability. Instead, twice, without citation to supporting material, the Does assert that Mary "Phillips with DYRS Director Vincent Schiraldi and DYRS management, decided to terminate services on May 21, 2007." Br. 13, 32. There is no evidence, however, that DYRS Director Schiraldi or other DYRS management was involved in the decision to close the twins' cases. Rather, the evidence shows that Ms. Phillips made that decision (Dkt. 189 (Ex. 33 at 5)), and she is not a District policy maker, but merely an employee. Without more, the District cannot be liable for her actions.

### III. Defendants Are Entitled To Summary Judgment On The Does' Claim That The District Failed To Provide Post-Adoption Services In Compliance With The *LaShawn A.* Consent Decree.

This Court should affirm the district court's determination that defendants are entitled to summary judgment on the Does' claim that the District failed to provide the post-adoption services mandated by the 1994 Modified Final Order in *LaShawn A. v. Kelly*, No. 89-1754 (D.D.C. Jan. 27, 1994). The Does are not intended third party beneficiaries with the right to enforce the consent decree; even if they were, they may not enforce it in an independent 42 U.S.C. § 1983 suit; and the Does have not shown in any event that the services they requested were mandated by the Modified Final Order.[10]

The Does were not parties to the *LaShawn* consent decree. To enforce a consent decree, "[t]hird parties . . . must demonstrate that they are intended beneficiaries." *S.E.C. v. Prudential Secs. Inc.*, 136 F.3d 153, 159 (D.C. Cir. 1998). A third party to a consent decree is not, contrary to the Does' suggestion, an intended beneficiary simply because "the parties to the consent decree had any intent to benefit that third party." *Id.*; *see* Br. 45-46. "To the contrary: a third party to a consent decree is not an 'intended beneficiary' unless the parties 'intended that a third party should receive a benefit *which might be enforced in the courts*.'"

---

[10]    As the judge overseeing the *LaShawn A.* consent decree, Judge Hogan was uniquely qualified to determine whether the Does could enforce that decree in this proceeding.

*Prudential Secs.*, 136 F.3d at 159 (quoting *Corrugated Paper Prods. v. Longview Fibre Co.*, 868 F.2d 908, 911 (7th Cir. 1989)).

"The scope of a consent decree must be discerned within its four corners." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).  In support of their contention that the parties to the *LaShawn A.* Modified Final Order intended third party beneficiaries such as themselves to be able to sue to protect their benefits, the Does point to the section of the Modified Final Order declaring that "[a]ll provisions of the Implementation Plan shall be implemented, shall be fully binding on the defendants, and shall be enforceable by the court."  Br. 45 (citing Dkt. 193 (Ex. 68 at 78)).  This ambiguous provision does not say that third party beneficiaries have any enforcement rights.  Moreover, the Does are not alleging a violation of, or seeking to enforce, the Implementation Plan, but rather seek to enforce an alleged violation of the Modified Final Order.  Br. 44.  The two are entirely separate.  Dkt. 193 (Ex. 68 at 81-84).  The Implementation Plan provides the steps for coming into compliance with the Modified Final Order.  *LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 88 (D.D.C. 2010).  Plaintiffs point to nothing in the Modified Final Order reflecting the consent-decree parties' intent that third party beneficiaries be able to enforce the Modified Final Order itself.

Moreover, even if the Modified Final Order were enforceable by third party beneficiaries, the Does provide no support for the proposition that they may

45

enforce the *LaShawn A.* consent decree in a 42 U.S.C. § 1983 suit. Rather, third-party enforcement of a consent decree must adhere to Fed. R. Civ. P. 71, which provides: "When an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party." That procedure does not include filing a separate 42 U.S.C. § 1983 suit. *Floyd v. Ortiz*, 300 F.3d 1223, 1226-27 (10th Cir. 2002); *DeGidio v. Pung*, 920 F.2d 525, 534 (8th Cir. 1990); *Martel v. Fridovich*, 14 F.3d 1, 3 n.4 (1st Cir. 1993). Thus, the Does may not enforce the *LaShawn A.* consent decree in this proceeding.

Finally, the Does have failed even to demonstrate that the services they were seeking were services to which they would have been entitled under the *LaShawn A.* Modified Final Order. The Does requested numerous services from CFSA, including physical modifications to their home; placement of Sara in a private school of their own choosing; and treatment of Wayne by non-agency-approved providers. JA 438-40, 520. But they presented no evidence showing that they were entitled to these extraordinary services, or any other services they requested, under the Modified Final Order. Thus, defendants are entitled to summary judgment on the Does' *LaShawn A.* claim.

**IV.    Defendants Are Entitled To Judgment On Plaintiffs' Common-Law Tort Claims.**

> **A.    Defendants are entitled to judgment on Ann and Oliver Doe's assault and battery claims.**

This Court should affirm the district court's determination that defendants are entitled to judgment on Ann and Oliver's assault and battery claims because the Does failed to plead sufficient facts to support their claims and failed to present sufficient evidence from which a rational trier of fact could find that defendants committed these torts.

Plaintiffs alleged that *all* District defendants assaulted and battered Ann and Oliver when defendants "intentionally and unlawfully caused [Ann and Oliver to] apprehend[] imminent physical harm" and "intentionally and unlawfully touched and restrained Ann and Oliver without their parents['] consent."  JA 77-78.  "An assault is 'an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff.'"  *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997) (quoting *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993)).  An "[a]ssault results from the apprehension of imminent harmful or offensive contract, in contrast to contact itself."  *Etheredge*, 635 A.2d at 916.  "'A battery is an intentional act that causes a harmful or offensive bodily contact.'"  *Holder*, 700 A.2d at 741 (quoting *Etheredge*, 635 A.2d at 916).  Specific intent is an indispensable element of both assault and battery and it is impossible to

47

negligently commit either tort. *Madden v. D.C. Transit Sys., Inc.*, 307 A.2d 756, 757 (D.C. 1973).

The Does' complaint, while making factual allegations regarding Ann and Oliver's removal from the Doe home on October 20, 2004, and their subsequent medical examinations, fails to allege facts supporting an assault and battery claim. The Does do not allege any facts that would support a claim that defendants Donald Walker, Maxwell, Jackson, Stowe, or Thompson Mallet assaulted or battered the children, nor did they present any evidence supporting such claims. Indeed, the complaint does not even allege that these defendants had any contact with the children.

With respect to defendants Philippart and King, while the Does allege that they came to the Doe home and removed Ann and Oliver, they do not allege that either actually made physical contact with the children, let alone intentionally harmful or offensive contact, or intentionally caused them apprehension of imminent physical harm. Moreover, they did not allege that the subsequent physical examinations constituted intentionally harmful or offensive contact, or that in the course of these examinations anyone intentionally caused them apprehension of imminent harm. They do not even allege that a District employee conducted the examinations. The complaint does not contain sufficient factual matter, accepted as true, to state a plausible claim to relief. *Iqbal*, 556 U.S. at 678.

48

In addition to failing to allege sufficient facts supporting their claims, the Does failed to present any evidence that the children sustained an assault or battery. Moreover, even if there was some evidence supporting plaintiffs' claims, the District employees' actions were privileged. Defendants had a statutory duty to investigate the allegations of sexual abuse occurring within the Does' home. D.C. Code §§ 4-1301.01, 4-1301.06 (2012 Repl.). Moreover, they had statutory authority to remove the children. D.C. Code §§ 4-1301.07, 4-1303.04(b), 16-2309(a)(4) (2012 Repl.). When defendants Philippart and King went to the Doe home, they believed that they had the legal authority to remove the children based on imminent danger. JA 198-99, 201-02, 497, 598. There is no allegation or evidence that excessive force was used in effectuating the children's otherwise lawful removal. *Magwood v. Giddings*, 672 A.2d 1083, 1088 (D.C. 1996); *Etheredge*, 635 A.2d at 916; *Bauldock v. Davco Food, Inc.*, 622 A.2d 28, 33 (D.C. 1993).

Notwithstanding the foregoing, plaintiffs contend that the district court erred by dismissing their claims on the ground that they failed to proffer sufficient evidence to overcome defendants' summary judgment motion when defendants only sought dismissal on the pleadings. Br. 46-47. There are three flaws with this argument. First, the district court's purported error does not provide a basis for reversal given that the standard of review here is *de novo*. *Tilton*, 6 F.3d at 688.

49

Second, the district court did dismiss plaintiffs' claims on their pleadings, as the District had requested. The district court held: "Since Plaintiffs do not plead sufficient facts to allow a jury to reasonably find in their favor, judgment is granted in favor of Defendants on the assault and battery claims." JA 265. Third, defendants touched on the sufficiency of the evidence in their summary judgment motion (Dkt. 186 at 29, 31); plaintiffs sought summary judgment on their claims for assault and battery (Dkt. 182-1 at 29); and defendants opposed that motion on the ground that plaintiffs had "simply failed to prove their claims" (Dkt. 194 at 27). The district courts' discussion of whether plaintiffs had presented sufficient summary judgment evidence in support of their claims was thus entirely proper.

**B.     Defendants are entitled to judgment on plaintiffs' invasion of privacy claim.**

This Court should affirm the district court's determination that defendants are entitled to judgment on the Does' common law invasion of privacy claim. In support of their tort claim, the Does vaguely alleged in Count XXI of their amended complaint that defendants intruded into their home and personal lives in a manner not authorized by law. JA 80. Here, the Does suggest that the invasion of privacy occurred on October 20, 2004, when Ann and Oliver were removed from their home. Br. 47. As established, however, exigent circumstances justified defendants' entry into the Doe home to protect Ann and Oliver from immediate

50

danger.  Therefore, the entry was lawful and reasonable, foreclosing relief on the Does' invasion of privacy claim.

"Invasion of privacy is not one tort, but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded."  *Wolf v. Regardie*, 553 A.2d 1213, 1216-17 (D.C. 1989).  These torts include the tort of intrusion upon one's solitude or seclusion.  *Id*. at 1217.  "The tort of intrusion upon seclusion has three elements: (1) an invasion or interference by physical intrusion . . . ; (2) into a place where the plaintiff has secluded himself . . . ; (3) that would be highly offensive to an ordinary, reasonable person . . . ."  *Id.*  This tort includes entering a plaintiff's home without permission.  *Id.*

As this Court has held, an invasion of privacy occurs when there is an intrusion into places where a plaintiff could *reasonably* expect the defendant to be excluded:

> We approve the extension of the tort of invasion of privacy to instances of intrusion, whether by physical trespass or not, into spheres from which an ordinary man is a plaintiff's position could reasonably expect that the particular defendant should be excluded. Just as the Fourth Amendment has expanded to protect citizens from government intrusions where intrusion in not reasonably expected, so should tort law protect citizens from other citizens.  The protection should not turn exclusively on the question of whether the intrusion involves a technical trespass under the law of property.  The common law, like the Fourth Amendment, should "protect people, not places."

51

*Pearson v. Dodd*, 410 F.2d 701, 707 (D.C. Cir. 1969) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967) (footnotes omitted)); *see also Danai v. Canal Square Assocs.*, 862 A.2d 395, 399-400 & n.4 (D.C. 2004).

Having disclosed that two of their children had been sexually abused over a period of four years and asked for assistance, the Does could not have reasonably expected that defendants should be excluded from their home, particularly after defendants concluded that the children faced an imminent danger of abuse. As the Supreme Court has explained, in such circumstances, it is readily understandable why government officials are not liable in a tort action:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. . . . Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes.

*Georgia v. Randolph*, 547 U.S. 103, 118 (2006) (citation omitted).

The Does seemingly recognize that a favorable ruling for defendants on their Fourth Amendment claim forecloses relief on their tort claim. In arguing for reversal, they simply assert that "the [d]istrict [c]ourt erred when it determined that the [d]efendants had a reasonable belief that the children were in immediate

52

danger." Br. 47. Given the fact that there was no Fourth Amendment violation and entry into the Does' home was reasonable, the Does' claim for invasion of privacy fails as a matter of law. *See Garay v. Liriano*, 943 F. Supp. 2d 1, 24-25 (D.D.C. 2013).

### C.    Plaintiffs failed to state a claim for relief on their claim for intentional infliction of emotional distress.

This Court should affirm the district court's determination that defendants are entitled to judgment on the Does' claim for intentional infliction of emotional distress. The Does failed to plead sufficient facts to support their claim and they failed to produce evidence from which a reasonable jury could find that the District's conduct rose to the level of "extreme and outrageous" and that they suffered "severe emotional distress."

"In order to prove the tort of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (internal quotation marks omitted); *accord Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982). To survive a motion to dismiss, the plaintiff must allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*

(internal quotation marks omitted); *accord Williams v. District of Columbia*, 9 A.3d 484, 494 (D.C. 2010); *Sere*, 443 A.2d at 37. To establish extreme and outrageous conduct, the facts alleged must be such that would arouse resentment against the actor and lead an average person to exclaim, "Outrageous!" *Ortberg*, 64 A.3d at 163. A court considers the context in which the conduct took place, examining the nature of the actions, the relationship of the parties, and the environment in which the conduct occurred. *Id.* There is no liability for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Id.* (internal quotation marks omitted); *accord Crowley v. N. Am. Telecomm. Assoc.*, 691 A.2d 1169, 1172 (D.C. 1997).

District of Columbia Court of Appeals precedent also sets a high standard with respect to the element of "severe emotional distress." *Ortberg*, 64 A.3d at 164. "Severe emotional distress" is "emotional distress of so acute a nature that harmful physical consequences might be not unlikely to result." *Id.* (internal quotation marks omitted); *accord Sere*, 443 A.2d at 37. Recovery is not permitted merely because the conduct causes mental distress, embarrassment and difficulty, or some worry and concern. *Crowley*, 691 A.2d at 1272. Instead, the conduct must be intended or likely to cause physical harm. *Id.*

Here, no reasonable jury could conclude that the District's actions upon learning that Ann and Oliver had been subjected to four years of sexual abuse were

extreme and outrageous—that they were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. The complained-of conduct—questioning whether the Does' counsel was operating under a conflict of interest; advising the Does of possible police involvement in the children's removal; determining that the children were in imminent danger of abuse; referring the allegations of neglect to the Office of the Attorney General for a papering decision; prosecuting the twins for the crimes they committed; and declining to provide services to which the Does have shown no entitlement—is not extreme and outrageous conduct. Br. 47-48. Rather, defendants took reasonable steps to insure the children's safety where the children faced imminent danger of further abuse. Moreover, to the extent that the Does suggest that they were subjected to repeated acts of discrimination as support for their claim that defendants' behavior was extreme and outrageous, their assertion fails for lack of evidentiary support. Br. 49.

On a separate note, the Does presented no evidence of likelihood of severe emotional distress. Their suggestion that they are peculiarly susceptible to emotional distress has no support in the record. Br. 49. For either reason, the district court properly granted judgment to defendants on this claim.

55

**D.    Defendants are entitled to summary judgment on the Does' abuse-of-process claim.**

This Court should affirm the district court's determination that defendants are entitled to summary judgment on the Doe's abuse-of-process claim.  There is no genuine issue as to any material fact and defendants are entitled to judgment as a matter of law.

"The essence of the tort of abuse of process is the use of the legal system 'to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do.'"  *Scott v. District of Columbia*, 101 F.3d 748, 755 (D.C. Cir. 1997) (quoting *Brown v. Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992)).   "[T]he fact that a person acts spitefully, maliciously, or with an ulterior motive in instituting a legal proceeding is insufficient to establish abuse of process." *Id.*  Rather, "[t]he usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." *Id*. (quoting Restatement 2d of Torts § 682 cmt. b (1977)).

Here, Ann and Oliver were removed from their home in the context of an ongoing neglect investigation intended to determine if they were neglected children.  This process was used to achieve the law's intended end—removal of the children to protect them from imminent abuse.  The Does' claim that defendants

56

were motivated by retaliatory animus (Br. 51) simply does not state a claim for abuse of process because removal of the children was within the regular purview of the neglect statute.[11]  "The fact that a plaintiff has an ulterior motive in filing suit is not enough to sustain a claim for abuse of process if there is no showing that the process was, in fact, used to accomplish an end not regularly or legally obtainable." *Wood v. Neuman*, 979 A.2d 64, 76-77 (D.C. 2009) (internal quotation marks and brackets omitted); *accord Scott*, 101 F.3d at 83 ("In the instant case, the officers instituted the criminal charge for precisely the purpose for which it was intended: establishing that Scott was guilty of a criminal offense.").

---

[11]     To the extent that the Does contend that there was an abuse of process because there was insufficient justification for the children's removal, the Court should reject their contention for the reasons discussed above.

57

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/  Stacy L. Anderson
STACY L. ANDERSON
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
May 2014                     (202) 724-6625

## CERTIFICATE OF SERVICE

I certify that on May 28, 2014, electronic copies of this brief were served through the Court's ECF system, to:

Mick G. Harrison

/s/ Stacy L. Anderson
STACY L. ANDERSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 13,872 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

/s/ Stacy L. Anderson
STACY L. ANDERSON